**CASE NO. 17-11919-DD**

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

_____

FELICIA A. WILCOX,
Plaintiff-Appellant

v.

CORRECTIONS CORPORATION
OF AMERICA a/k/a McCRAE
CORRECTIONAL FACILITY,
Defendant-Appellee

_____

Appeal from the United States District Court
Northern District of Georgia
Case No. 1:11-cv-04365-ODE

_____

**APPENDIX**

VOLUME III

_____

Neil L. Henrichsen
Helen H. Albee
Henrichsen Siegel, P.L.L.C.
301 W. Bay St., 14th Floor
Jacksonville, FL  32202
(904) 381-8183
(904) 212-2800 FAX
Attorneys for Appellant

# TABLE OF CONTENTS

| TAB NO. | DOCUMENT | VOLUME NO. |
|---------|----------|------------|
| **Docket** | U.S. District Court – Northern District of Georgia (Atlanta) Civil Docket for Case # : 1:11-cv-04365-ODE | I |
| **1** | Complaint | I |
| **7** | Answer to Complaint | I |
| **98** | Motion For Judgment As A Matter of Law | I |
| **101** | Minute Entry for Proceedings held before Judge Orinda D. Evans: Jury Trial continued on 08/16/2016 | I |
| **104** | Jury Verdict for Plaintiff | I |
| **106** | Clerk's Judgment in Favor of Plaintiff | I |
| **108** | Plaintiff's Exhibit List with clerk's notes | I |
| **110** | Clerk's Note re Admitted Plaintiff and Defendant's Exhibits[1] | I |
| **110-3** | Plaintiff's Exhibit 3: Harassment/Sexual Harassment policy | I |
| **110-8** | Plaintiff's Exhibit 8: Employee Civilian Incident Statement 07/10/2009 | I |
| **110-9** | Plaintiff's Exhibit 9: Wilcox Complaint dated 07/23/2009 | I |
| **110-10** | Plaintiff's Exhibit 10: Investigation Report From Golden dated 09/09/2009 | I |

---

1 The original Exhibits with labels corresponding to the numbering on Plaintiff's Exhibit List [Doc. 108] were retained by the Clerk and are included in the Record. The Exhibits included in the Appendix are correct copies of the original Exhibits with the exception of the exhibit labels appearing on them which should be disregarded.

| 110-11 | CCA Facility Employee Problem Solving Notice dated 09/14/2009 | I |
|--------|---------------------------------------------------------------|---|
| 112 | Motion to Alter Clerk's Judgment [Defendant's Rule 50/59 Motion] and Brief in Support | I |
| 117 | Response in Opposition re: 112 Motion to Alter Clerk's Judgment | I |
| 120 | Reply Brief re: 112 Motion to Alter Clerk's Judgment | I |
| 123 | Excerpt of Transcript of Proceedings held on 08/09/2016 (Jury Trial) | II |
| 124 | Transcript of Proceedings held on 08/10/2016 (Jury Trial) | II |
| 131 | Order: Defendant Corrections Corporation of America's Renewed Motion For Judgment | **III** |
| 132 | Clerk's Judgment in favor of Corrections Corporation of America against Wilcox, Felecia | **III** |

# TAB NO. 131

FILED IN CHAMBERS
U.S.D.C. - Atlanta

MAR 31 2017

James H. Hatten, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FELICIA A. WILCOX,

      Plaintiff

v.

                        CIVIL ACTION NO.
                        1:11-CV-4365-ODE

CORRECTIONS CORPORATION OF
AMERICA a.k.a. MCRAE
CORRECTIONAL FACILITY,

      Defendant

## ORDER

This case involves claims that Plaintiff, a corrections officer employed by Corrections Corporation of America ("CCA") was sexually harassed by Sgt. Larry Jackson, another of CCA's corrections officers. The case is before the Court on Defendant CCA's Renewed Motion for Judgment as a Matter of Law or to Alter or Amend Judgment [Doc. 112] and Motion for Stay of Execution [Doc. 115], Plaintiff Felicia Wilcox' Motion for Attorneys' Fees and Expenses [Doc. 107], Supplemental Motion for Attorneys' Fees [Doc. 116], and Application for Writ of Execution [Doc. 129]. For the reasons stated below, Defendant CCA's Renewed Motion for Judgment as a Matter of Law or to Alter or Amend Judgment [Doc. 112] is GRANTED in part, and DISMISSED AS MOOT in part, Defendant CCA's Motion for Stay of Execution [Doc. 115] is DISMISSED AS MOOT, and Plaintiff Wilcox' Motion for Attorneys' Fees and Expenses [Doc. 107], Supplemental Motion for Attorneys' Fees [Doc. 116], and Motion for Writ of Execution [Doc. 129] are all DISMISSED AS MOOT.

## I.   **Procedural Background**

Plaintiff Wilcox' Complaint [Doc. 1] sets forth the following claims: (1) sexual harassment under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, et seq. ("Title VII") and 42 U.S.C. § 1981(a) (Count I); (2) race discrimination under Title VII and Section 1981(a) (Count II); and (3) retaliation under Title VII and Section 1981(a) (Counts I and II) [Id.].  On February 26, 2014 this Court granted summary judgment to CCA on all claims [Doc. 54].

Wilcox appealed to the United States Court of Appeals for the Eleventh Circuit on the sexual harassment and retaliation claims [Docs. 57, 64 at 2].  On March 11, 2015 the Court of Appeals reversed the grant of summary judgment to CCA on the sexual harassment claim only [Doc. 64].  The Court of Appeals held that, taken in the light most favorable to Wilcox, she had alleged harassment severe or pervasive enough that a reasonable jury could find for Wilcox on that element of her claim [Id. at 8].  On that basis, the Eleventh Circuit remanded the case to this Court for a trial on the sexual harassment claim [Id. at 12].

On August 9-12, 2016 a jury trial was held on Wilcox' sexual harassment claim [Docs. 97, 100, 101, 105].  Defendant CCA made a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a)(1) at the close of Plaintiff's case in chief [Docs. 98, 101, 124 at 125-34].  CCA argued that Plaintiff had not produced evidence that Larry Jackson, Wilcox' alleged harasser, was her supervisor as defined by the Supreme Court's holding in Vance v. Ball State University, 133 S. Ct. 2434 (2013) [Docs. 98-1 at 5-6, 124 at 125-28, 132].  Therefore, his actions could not be attributed to CCA so as to produce vicarious liability [Docs. 98-1 at 6-8, 124 at 127-29, 132].

2

Wilcox argued in response that Jackson's misconduct was so "open and notorious" that CCA must have known about it [Doc. 124 at 130]; therefore CCA would be liable for Jackson's actions.

This Court denied CCA's motion while stating it might later change its mind [Doc. 124 at 133].  CCA then presented its evidence [Docs. 124 at 134-46, 125 at 3-48].  Plaintiff testified in rebuttal [Doc. 125 at 49-55].

At the charge conference, CCA objected to Plaintiff's proffered punitive damages charge on grounds that it was unfairly surprised by the punitive damages claim [Doc. 125 at 60-64].   The Court rejected that objection [Id. at 63].   After closing arguments, the Court charged the jury [Id. at 101-15].  This included a charge on punitive damages.  Defendant objected on grounds of unfair surprise as to the punitive damages claim and on other grounds not germane to the issues presented here [Doc. 126 at 24-25].  CCA did not object on grounds that the evidence did not warrant a punitive damages instruction.

On August 12, 2016 the jury returned a verdict for Wilcox awarding her $4,000 in compensatory damages and $100,000 in punitive damages [Doc. 104].  Judgment was entered the same day [Doc. 106].

CCA filed a timely Renewed Motion for Judgment as a Matter of Law or to Alter or Amend Judgment [Doc. 112], and a Motion for Stay of Execution [Doc. 115].  Wilcox responded in opposition [Docs. 117, 119].  CCA replied [Docs. 120, 122].

Wilcox filed a timely Motion for Attorneys' Fees and Expenses [Doc. 107], a Bill of Costs [Doc. 114], a Supplemental Motion for Attorneys' Fees [Doc. 116], and a Writ of Execution [Doc. 129].  CCA filed timely responses in opposition [Docs. 111, 121, 130].  Wilcox

filed a Reply [Doc. 118] in support of the Motion for Attorneys' Fees and Expenses.

All motions are before the Court for ruling.

II. **Discussion**

    A.   **CCA's Renewed Motion for Judgment as a Matter of Law or to Alter or Amend Judgment**

CCA argues that it is entitled to judgment as a matter of law under Fed. R. Civ. P. 50(b)(3) on Wilcox' sexual harassment claim, or in the alternative, the Court should vacate or significantly reduce the punitive damages award under Fed. R. Civ. P. 59(e) [Doc. 112-1]. After carefully considering both sides' submissions, CCA's Motion [Doc. 112] is GRANTED IN PART and DISMISSED IN PART. The Renewed Motion for Judgment as a Matter of Law [Doc. 112] is GRANTED and the Motion to Alter or Amend Judgment [Doc. 112] is DISMISSED AS MOOT.

    1.   **Judgment as a Matter of Law**

      a.   **Plaintiff's Case in Chief**

Plaintiff called the following witnesses in her case in chief: Plaintiff Felicia Wilcox, former corrections officer at McRae Correctional Institution ("McRae"), Officer Kim Heller (corrections officer at McRae), Walter Wells (Warden at McRae), Shannon Pooler (Human Resources Manager at McRae), Kenya Golden (a CCA investigator at another facility), and Darryl Goodner (in-house CCA investigator at McRae). The parties stipulated to the admissibility of Plaintiff's documents at the beginning of the trial; all documents were admitted without objection [Doc. 123 at 44-45]. Stipulated facts were read to the jury [Doc. 124 at 123-25].

The following testimony was admitted during Plaintiff's case in chief. McRae is a low security federal prison housing alien

4

population felon inmates [Doc. 124 at 66, *Wells* Testimony ("Test.")] located in McRae, Georgia [Doc. 123 at 38, *Wilcox Test.*], a town about 160 miles southeast of Atlanta. Defendant CCA furnishes corrections personnel to McRae and a number of other prisons [Docs. 123 at 38-39, *Wilcox Test.*, 124 at 123-24, *Jt. Stip.*, 124 at 19, *Heller Test.*, 124 at 32-34, *Wells Test.*].

In 2009 McRae had a population of about 1750 male inmates [Doc. 124 at 36-37, *Wells Test.*] and approximately 340 employees [Id. at 36, *Wells Test.*]. It had a military-like chain of command [Doc. 123 at 40-41, *Wilcox Test.*]. The Warden was the top manager at the facility [Doc. 123 at 40-42, *Wilcox Test.*, Doc. 124 at 34; *Wells Test.*]. The Warden reported to a regional head at CCA's corporate office in Nashville, Tennessee [Doc. 124 at 34-35, *Wells Test.*]. Below the Warden at McRae was an Assistant Warden, Chief, Assistant Chief, Captain, Lieutenant, Sergeants, and then line corrections officers such as Plaintiff Wilcox [Doc. 123 at 40, *Wilcox Test.*, see also Doc. 124 at 21, *Heller Test.*].

Wilcox began working for CCA at McRae in April 2004 [Doc. 123 at 38, *Wilcox Test.*]. In 2009 she was a Commissary Officer in the prison store where inmates could obtain food items [Id. at 39].

Beginning at a time prior to Plaintiff's employment CCA had a written, published policy forbidding sexual harassment in the workplace [Doc. 110-3, *Pl.'s Ex. 3*]. Wilcox agrees the policy is a zero tolerance policy [Doc. 123 at 94, *Wilcox Test.*]. She was given a copy of CCA's sexual harassment policy [Id. at 52, *Wilcox Test.*]. She agrees she signed acknowledging receipt of the sexual harassment policy [Id. at 49, 92-95, *Wilcox Test.*]. Wilcox received training on CCA's policies and procedures in training sessions [Id. at 49, *Wilcox*

*Test*.].   She received refresher training once a year [Id. at 50, *Wilcox Test*.].

CCA's policy provides instructions to employees as to how to report instances of sexual harassment to management [Doc. 110-3, *Pl.'s Ex. 3* at 2].   Specifically, CCA's policy says that if an employee feels she is a victim of sexual harassment, she is "strongly urged" to take one of two actions [Id.].   "At the Facility level," the employee should either "report [the harassment] to the Facility Personnel Coordinator/Warden or the Corporate Director, Personnel; or utilize the Employee Grievance Procedures" [Id.].   The policy states that allegations of harassment would be promptly investigated, and the results of the investigation reported to the employee [Id.].   During her employment Plaintiff signed a number of statements acknowledging she read and understood CCA policies, including specifically the sexual harassment policy [Doc. 123 at 49, 92-92].

Plaintiff testified that in 2009 Sgt. Larry Jackson was her immediate supervisor [Doc. 123 at 41, *Wilcox Test*.].   She then clarified that this meant she would report to Jackson if she was having problems with inmates at her post, and seek his assistance [Id. at 42, *Wilcox Test*.].   No one was assigned to supervise Plaintiff's work in the Commissary Office [see Doc. 123 at 39, 88, *Wilcox Test*.].   The Commissary staff consisted of Wilcox plus one clerical employee supervised by Wilcox [see id. at 88].   Jackson did not produce Wilcox' annual evaluations [Docs. 110-13, *Pl.'s Ex. 13*, 110-14, *Pl.'s Ex. 14*].   There is no evidence that he was consulted in connection with the evaluations.   He had no power to hire, fire, promote, or demote Wilcox [Doc. 124 at 69; *Wells Test*.].   Further, Jackson could not cut her pay, assign her overtime, reassign her to

a new post, or issue formal discipline against her [Id.]. Jackson worked in a roving capacity, moving a good bit around the institution in different assignments [Id. at 64, *Wells Test*.]. He was a "hallway sergeant" [Doc. 124 at 21, *Heller Test*.]. It is inferable that, as a sergeant, Jackson was Wilcox' superior and that he could give her instructions she would be expected to follow, at least in the security arena.

Beginning in January 2009, Wilcox and Jackson saw each other as they arrived for the 7:00 A.M. to 3:00 P.M. shift [Doc. 123 at 49, 61, *Wilcox Test*.]. At that time, "he would always hug me and caress me down my back" [Id. at 61-62, *Wilcox Test*.].[1] With other female but not male employees, "when [he] would embrace them, he would caress them down their back, and I even seen him one day caress one female all the way down to her buttocks" [Id. at 62, *Wilcox Test*.].

The foregoing is the entire substance of Wilcox' trial testimony concerning Jackson's hugs/caresses, whether of herself or others. She did not testify that she told him at any time during this period

---

[1]Wilcox testified that Jackson's hugs/caresses began after her husband, a corrections officer at McRae, was terminated in December 2008, and was no longer around [Doc. 123 at 62, *Wilcox Test*.]. Ironically, Mr. Wilcox was fired for sexual harassment [Doc. 124 at 74-75, *Wells Test*.].
Although Wilcox indicated that this behavior occurred every day starting in January 2009 when she and Jackson met while arriving for work [Doc. 123 at 100-01, *Wilcox Test*.], she did not state how long this behavior went on.
While the Court of Appeals noted that Wilcox' "deposition and affidavit describe harassment that a reasonable jury could conclude was severe or pervasive, including unwanted daily physical contact [hugs] over a period of months" [Doc. 64 at 7], there was no trial testimony regarding how long the hugging went on. It can be inferred that the hugs happened numerous times from Wilcox' use of the words "always" and "would".

to stop this conduct nor did she testify that she told anyone else about it.

Corrections Officer Heller[2] testified that Jackson frequently hugged her and other corrections officers [Doc. 124 at 21-22, *Heller Test.*]. Jackson would "hug on them, squeeze them real tight" [*Id.* at 26, *Heller Test.*]. She testified: "Well, he was -- Jackson was kind of -- he played a lot, you know, so he would do it kind of often. He played a lot, you know, he was a joking person, so he played a lot" [*Id.* at 22, *Heller Test.*]. Also, "Well, everyday he would come to my post, you know, he would joke. I mean that's just what he did. He would joke all the time. Every time that he entered on my post he would. Q: And would the joking usually be in a sexual way? A: Yeah" [*Id.* at 25, *Heller Test.*].

Heller stated that Jackson's actions did not bother her at the time [*Id.* at 27, *Heller Test.*] but they did bother Wilcox [*Id.* at 23, *Heller Test.*]. Heller said "Well, she wasn't like me. I played around a lot, and she was more serious, and she didn't like all that playing around and all that touching and talking the way, you know, we talked or he talked around us, she didn't care for none of that" [*Id.* at 23, *Heller Test.*].

One day in the spring of 2009, Wilcox was visiting Heller in the Education Office [Docs. 123 at 56, *Wilcox Test.*, 124 at 23, *Heller Test.*]. Jackson joined them [*Id.*]. During this conversation Jackson said "when I was in the military in San Diego, I had a friend, a female friend, and her . . . spur tongue was as long as [my] dick"

---

[2]Officer Heller is an education officer at McRae and is Plaintiff Wilcox' sister [Doc. 124 at 19-20].

8

[Doc. 123 at 56, *Wilcox Test*., see also Doc. 124 at 23, *Heller Test*.]. This upset Wilcox [Doc. 123 at 57, *Wilcox Test*., Doc. 124 at 23, *Heller Test*.]. When Wilcox got up to leave, Jackson grabbed her arm to stop her and Wilcox pulled away [Doc. 123 at 57, *Wilcox Test*.].

In June 2009 while Wilcox was again visiting Heller at her post, Jackson sat down beside Wilcox and grabbed and squeezed her thigh [Doc. 123 at 55, *Wilcox Test*.; Doc. 124 at 22-23, *Heller Test*.]. In describing that incident Wilcox alternatively said that Jackson had "rubbed" her thigh [Doc. 110-10, *Pl.'s Ex. 10* at 2]. When Wilcox told him to stop and slapped his hand, he commented that "he could touch [her] fat juicy thighs any time he felt like he wanted to" [Doc. 123 at 55; *Wilcox Test*.]. Wilcox found that very offensive [Id. at 55-56, *Wilcox Test*.].

Wilcox did not report to anyone Jackson's grabbing or rubbing her thigh/making the fat juicy thighs comment or the comment about his female friend in the military [Id. at 58-59, *Wilcox Test*.]. She testified this was because she felt Jackson was "favored by management" [id.]; she had observed Jackson laughing and talking with the Warden, Chief Spires and Assistant Chief Yancey [id. at 60, *Wilcox Test*.].

On July 10, 2009 a large group was leaving a staff meeting in the Captain's office [Id. at 54, *Wilcox Test*]. Jackson was behind Wilcox and he slapped her twice on the buttocks [Id.]. The same day Wilcox told Andrea Tobler[3] who was filling in in McRae's Human

---

[3]Tobler reported to Shannon Pooler, McRae's head of Human Resources [see Doc. 123 at 68, *Wilcox Test*.].

9

Resources Department about the incident [Doc. 123 at 57-59, *Wilcox Test.* (citing Doc. 110-8, *Pl.'s Ex. 8*)].  She prepared a written complaint on a form given to her by Tobler [Id.].  The complaint was dated July 10 and said in its entirety: "I Officer F. Wilcox was exiting Captain Office from staff meeting when Sgt. Larry Jackson slapped me on my Butts twice in the presence of Officer Rosa McRae and Sgt. Chris Sammons" [Doc. 110-8, *Pl.'s Ex. 8*].[4]

Pooler took Wilcox' July 10 complaint concerning the butt-slapping incident to the Warden on July 10 [Doc. 124 at 113, *Pooler Test.*].  Wells obtained and reviewed affidavits from Jackson and other employees [Doc. 124 at 71, 88-89, *Wells Test.*].  The affidavits were not prepared by McRae's in-house investigator and they are not in the record.  Wells testified he got the affidavits "through [Shannon] Pooler"; she was McRae's Human Resources Manager [Id. at 89, *Wells Test.*].  Pooler testified that she did not get the affidavits; the normal course of action was for Wells to contact Goodner to do any investigative work [Doc. 124 at 109, *Pooler Test.*].  Goodner testified he did not conduct any investigation concerning the butt-slapping incident [Id. at 122, *Goodner Test.*].  Wells explained that while he testified in his deposition in 2013 that Goodner conducted the investigation, he now has doubts as to whether that was the case [Id. at 39-42, *Wells Test.*]  He ascribes a possible memory lapse to the passage of time between 2009 and the deposition date [Id.].  The Golden Report, discussed below, suggests that perhaps

---

[4]There is no evidence that any of Jackson's off-color comments or the thigh-grab, hugs, or butt slaps were heard or seen by inmates.

Jackson obtained at least one affidavit [Doc. 110-10, *Pl.'s Ex. 10* at 5].

Wells found Wilcox' complaint was unsubstantiated as sexual harassment [Doc. 124 at 41, 57-58 (citing Doc. 42-1 at 100), 72-73, *Wells Test.*].  He determined, in apparent reliance on one or more of the affidavits, that Jackson had been brushing Wilcox' jacket to get something off the jacket [Id. at 54-55, 70, *Wells Test.*].  Wells also explained that he had found in working with Wilcox that she had a tendency to overreact "and make accusations against people that were later found unfounded" [Id. at 86, *Wells Test.*].  This observation tends to be corroborated by the Golden Report, discussed below, which found that Wilcox' claims of race discrimination were based on misperceptions by Wilcox [Doc. 110-10, *Pl.'s Ex. 10* at 1].

Almost immediately after the July 10 complaint Wells instructed his Chief of Security to tell Jackson "not to associate with [Wilcox] or be anywhere around her" [Doc. 124 at 42, 64, *Wells Test.*]. Plaintiff admits that Jackson never touched her in any manner, or made any inappropriate comments to her after her July 10 Complaint [Doc. 123 at 108-10, *Wilcox Test.*].

On or about July 20, 2009 Wilcox spoke to Pooler about lack of action on her July 10 complaint [Docs. 110-9, *Pl.'s Ex. 9* at 2, 123 at 67, *Wilcox Test.*].  Pooler suggested Wilcox create a paper trail of Jackson's actions [Doc. 123 at 68-69, *Wilcox Test.*].  With Pooler's help, Wilcox created a Complaint in the form of a Memorandum dated July 23, 2009 [Doc. 123 at 69-70 (citing Doc. 110-9, *Pl.'s Ex. 9*), *Wilcox Test.*].  The Complaint first listed five or six incidents/matters beginning October 14, 2008 which had upset Wilcox and which had nothing to do with Jackson or sexual harassment [Doc.

11

110-9, *Pl.'s Ex. 9* at 1-2]. These pertained to actions of various CCA employees other than Jackson which allegedly were motivated by race discrimination [Id.]. Wilcox is African-American. The last two matters in the July 23, 2009 complaint were as follows:

> July 10, 2009 at 0830 hrs.
>
> Sergeant Larry Jackson hit me twice on my buttocks. I reported it to Human Resource Department Andrea Tobler (Acting) and Warden Wells, I was informed thru Ms. Tobler from Warden Wells to write a statement.
>
> July 20, 2009 at 1030 hrs
>
> I requested an update from Ms. Pooler and Chief Spires regarding the status of my complaint against Sgt. Jackson. Since no action has yet been taken against Sgt. Jackson and he continues to work around me, I requested this update. Sgt. Jackson continues to be on my post and I am afraid he will touch me again. Since this is not the first time that he has touched me. I have told him previously not to touch me and he responded to me that he could touch me if he want to.

[Id. at 2].

Pooler told the Assistant Warden following Wilcox' July 20 visit that Wilcox was concerned about Jackson being around her [Doc. 124 at 110, *Pooler Test.*]. The Assistant Warden said he would handle the situation [Id.]. Pooler gave Warden Wells Wilcox' July 23 complaint on July 23 [Id. at 113, *Pooler Test.*].

Wells referred Wilcox' July 23, 2009 complaint to CCA's regional office on July 23 [Doc. 124 at 57; *Wells Test.*]. CCA's Ethics Office then took over the investigation [see id., see also Doc. 110-10, *Pl.'s Ex. 10* at 1].

Wilcox asked Pooler several times why nothing was being done about her complaint, and Pooler told her the Warden was handling it [Doc. 123 at 75, *Wilcox Test.*]. When Wilcox spoke to Wells in mid-August 2009 to determine why there was no response to her complaint,

"[h]e told me to go back and continue my job" [Id. at 76, *Wilcox Test.*].

Wilcox testified that Jackson engaged in intimidating behaviors towards her following her July 23 Complaint:

> [o]ne in particular time I was following behind him down the hallway, and there was this metal machine standing there, and he took his fist and hit the metal machine and looked at me and rolling [sic] his eyes.  So I thought that was very intimidating and harassing, and I felt that was coming from me filing the complaint that he had slapped me on my buttocks.
>
> . . . Like I said when he would come on my post, he was like rolling his eyes, and if he was standing across from the dining hall and he would, you know, make eye contact with me, he would roll his eyes at me.
>
> . . . .
>
> I've observed him a time standing across when he would roll his eyes at me, and he would clinch his fist, and be doing this (indicating).

[Doc. 123 at 71-72, *Wilcox Test.*].  There is no evidence that Wilcox reported these actions by Jackson to anyone at McRae.

On August 27, 2009 Wilcox became aware that Kenya Golden was investigating her complaints [Doc. 123 at 73, *Wilcox Test.*].  Kenya Golden was an investigator who worked for CCA at another facility [Doc. 124 at 42, *Wells Test.*]  She was sent to McRae to investigate the allegations in Wilcox' July 10 and July 23 complaints [Doc. 124 at 91-95, *Golden Test.* (citing Doc. 110-10, *Pl.'s Ex. 10*)].  Golden's on-site investigation began August 27, 2009 [Doc. 124 at 96-97 (citing Doc. 110-10, *Pl.'s Ex. 10* at 1), *Golden Test.*].  She interviewed 16 McRae employees including Plaintiff and Jackson concerning Plaintiff's allegations of sexual harassment and race discrimination which were in the July 10 and July 23 complaints [Doc. 124 at 97, *Golden Test.*, Doc. 110-10, *Pl.'s Ex. 10* at 1].

13

Wilcox told Golden on August 27 that she had been slapped on the buttocks twice by Jackson [Doc. 110-10, *Pl.'s Ex. 10* at 1]. In addition, she reported for the first time that Jackson had rubbed her thigh and told her he could "touch her juicy, fat thighs if he wanted," and that he had made the statement about his female friend in the military in her presence [Id. at 2]. Golden's report ("Report") does not say Wilcox reported that Jackson had hugged and caressed her on a daily basis beginning in January 2009, or in fact, that Wilcox reported anything about Jackson hugging or caressing her. Golden testified that Wilcox did not tell her about the hugs and caresses [Doc. 124 at 103, *Golden Test*]. Wilcox gave no testimony disputing this. Thus, there is no dispute concerning the fact that Wilcox never reported the hugs/caresses accusation (allegedly a daily occurrence from January 2009 until some unspecified time) until years after Jackson had been fired, this lawsuit was filed, and Wilcox' deposition was taken.

Golden issued her Report on September 9, 2009. It included the matters which Wilcox had told Golden about. It also included information from others including the following:

One employee reported that on one occasion while he was in the master control room he observed Jackson rubbing Officer Yukeyla Byron on the butt. This same employee also indicated that he has witnessed Jackson hugging other female employees and rubbing their backs in a downward motion going towards their butts.

One male employee indicated that a female employee complained to him that Senior Correctional Officer Larry Jackson hugged her and made inappropriate comments of a sexual nature to her. In response, he spoke with Jackson and advised him to cease contact with the employee. The employee also alleged that he heard Jackson make comments about certain female officer's butts and breasts "getting big". He also witnessed Jackson hug Officer Yukeyla Byron and rub her on the butt and arms. Per the employee, some

14

days Officer Byron would tell Jackson to stop and other days she did not appear to resist his actions.

An employee also reported that while at a cook out held at the training building, he observed Jackson rubbing a female employee on the butt and telling her that he liked her "apple bottom" jeans.

A female employee reported that on one occasion, she asked Jackson for the keys to the restroom and as he was giving her the keys he told her that he would drink her water (urine). According to this employee, Jackson also told her that he wanted to "eat her inside out". She reported that on a separate occasion, Jackson put his hand in her back pocket, and she immediately redirected him; however, he has continuously made personal comments to her regarding how "fine" she is and how good she looks.

[Doc. 110-10, *Pl.'s Ex. 10* at 3]. The Report said Officer Byron had not been interviewed because she was on medical leave [Id.]

The Report stated that two anonymous notes had been received by McRae management regarding Jackson's inappropriate actions towards female employees [Id. at 2]. Shannon Pooler, Human Resources Manager, was the recipient [Doc. 124 at 111, *Pooler Test.*]. Pooler gave the notes to Wells [id.], and apparently either Wells or Pooler gave them to Golden [id., Doc. 110-10, *Pl.'s Ex. 10* at 2]. The record does not contain the anonymous notes or indicate when they were received. The Report states that the notes said Jackson had "groped" Officer Yukeyla Byron and other female officers in the master control room area, and one note stated that employees were afraid to report the matter due to fear of retaliation [Doc. 110-10, *Pl.'s Ex. 10* at 2]. Warden Wells instructed Shannon Pooler to investigate further [Id.]. Pooler asked Officer Byron if any staff member had touched her inappropriately or had made comments of a sexual nature; Byron said no [Id.]. Byron said that "Jackson would often hug her but that he hugged everybody else too" [Id.]. Byron

15

stated that "she was not offended by Jackson's action and that if she was, she would let him know" [Id.].

The Report concluded as follows:

> [U]pon gaining knowledge of the concerns presented by Correctional Officer Felicia Wilcox, Warden Walt Wells, attempted to appropriately address the matters by directing and/or conducting formal inquiries into her concerns. It is observed that Felicia Wilcox was not satisfied with the facility's action in response to her claims; however, there is no evidence or information to support that Warden Walt Wells knowingly failed to take appropriate action or deliberately ignored her concerns.

[Id. at 5].

Wells read the September 9, 2009 Report [Doc. 124 at 47 (citing Doc. 110-10, *Pl.'s Ex. 10*), *Wells Test.*]. He recommended to CCA's Managing Director that Jackson be fired [Id. at 48-49, *Wells Test.*]. The Managing Director agreed [id. at 49, *Wells Test.*], and on September 14, 2009 Wells fired Jackson [id. (citing Doc. 110-11, *Pl.'s Ex. 11*)]. Wells' recommendation took into account Wilcox' complaints but he was mostly persuaded by what others had reported about Jackson's conduct [Id. at 55, 57-60 (citing Doc. 42-1 at 100-101), *Wells Test.*].

### b. Discussion

In ruling on CCA's renewed motion brought under Fed. R. Civ. P. 50(b)(3) the Court is looking again at CCA's argument that the evidence presented in Wilcox' case in chief precludes judgment in her favor as a matter of law. Defendant may seek judgment as a matter of law at any time when Plaintiff "has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [Plaintiff]." Fed. R. Civ. P. 50(a)(1). If the court denies the motion, "the court is considered to have submitted the action to the

16

jury subject to the court's later deciding the legal issues raised by the motion."[5]  Fed. R. Civ. P. 50(b).  Upon the filing of a timely renewed motion for judgment as a matter of law, the trial court may either allow judgment on the verdict, order a new trial, or direct the entry of a judgment as a matter of law.  Id.  In a case like this one--where the mid-trial motion addresses the adequacy of the evidence in Plaintiff's case in chief--only the evidence admitted in Plaintiff's case in chief is considered when ruling on the post-trial renewed motion.  The court may not resolve disputes in the evidence by resort to witness credibility.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citing Lytle v. Household Mfg., Inc., 494 U.S. 545, 554-55 (1990)).  It must resolve any factual disputes and draw all reasonable inferences in favor of the nonmoving party, here the Plaintiff.  Id.

Defendant's Renewed Motion for Judgment as a Matter of Law argues again that Plaintiff failed to produce necessary evidence in her case in chief to support her claim that anyone in McRae management had actual or constructive knowledge that Plaintiff was being subjected to sexual harassment by Jackson prior to September 9, 2009 [Doc. 112-1 at 2-8.  Defendant further argues that CCA's response to Plaintiff's allegations was prompt and remedial [Id. at 8-13].

"[A]n employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer

_____

[5]In 2006 Rule 50 was amended.  One change was to drop the requirement that when the motion was denied it had to be reasserted at the close of all of the evidence in order to preserve the opportunity for post-judgment relief.  Fed. R. Civ. P. 50 Advisory Committee Note to 2006 amendment.

to take tangible employment actions against the victim." <u>Vance v.</u>
<u>Ball State Univ.</u>, 133 S. Ct. 2434, 2439 (2013). The ability to take
tangible employment actions means that the purported supervisor can
"effect a 'significant change in employment status, such as hiring,
firing, failing to promote, reassignment with significantly different
responsibilities, or a decision causing a significant change in
benefits'" for the victim. <u>Id.</u> at 2443 (quoting <u>Burlington Indus.,</u>
<u>Inc. v. Ellerth</u>, 524 U.S. 742, 761 (1998)). The evidence here shows
without doubt that Jackson was not Wilcox' supervisor in 2009 as that
term was defined in <u>Vance</u>. Jackson could not hire, fire, demote, or
reassign Wilcox, nor cause a significant change in her benefits.
Therefore, the test applicable to Plaintiff's claim is that
originally announced in <u>Henson v. City of Dundee</u>, 682 F.2d 897 (11th
Cir. 1982) and reaffirmed in <u>Breda v. Wolf Camera & Video</u>, 222 F.3d
886 (11th Cir. 2000). Specifically, "[w]here . . . the plaintiff
seeks to hold the employer responsible for the hostile environment
created by the plaintiff's . . . coworker, she must show that the
employer knew or should have known of the harassment in question and
failed to take prompt remedial action." <u>Henson</u>, 682 F.2d at 905, <u>see</u>
<u>also</u> <u>Breda</u>, 222 F.3d at 889 (noting "[e]mployer liability in a case
involving sexual harassment by a co-worker exists when the employer
knew (actual notice) or should have known (constructive notice) of
the harassment and failed to take remedial action.").

Employers are insulated from liability for constructive notice
of sexual harassment where they have comprehensive, well-known, well-
enforced anti-harassment policies.

> In sum, we hold that an employer is insulated from
> liability under Title VII for a hostile environment sexual
> harassment claim premised on constructive knowledge of the

18

> harassment when the employer has adopted an anti-
> discrimination policy that is comprehensive, well-known to
> employees, vigorously enforced, and provides alternate
> avenues of redress.

Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1554 (11th Cir. 1997).  Further, the Eleventh Circuit held: "[w]hen a company has developed and disseminated such a policy, 'it has fulfilled its obligation to make reasonably diligent efforts to "know what is going on" within the company'" and "'the existence of [such a] policy precludes a finding of constructive knowledge.'"  Hill v. Wal-Mart Stores, Inc., 510 F. App'x 810, 815 (11th Cir. 2013) (quoting Farley, 115 F.3d at 1153-54)).

Based on Farley, Wilcox' sexual harassment claim, to the extent it is based on constructive notice of Jackson's misconduct is not viable because CCA has (and had in 2009) a well-defined sexual harassment policy which gave clear direction as to how to make a claim of sexual harassment.  The policy was enforced, as shown by the firing of Plaintiff's husband.  Plaintiff actually knew about the policy and was familiar with the terms of the policy; she properly filed a complaint about the butt slaps on July 10, 2009.[6]

---

[6]CCA learned about the thigh grabbing, fat juicy thighs comment, and the comment about Jackson's female friend in the military on September 9, 2009 when investigator Kenya Golden turned in her Report.  The final complaint by Plaintiff (the hugs/caresses starting in January 2009 and ending at some unknown point in time) was not made until her March 2013 deposition--more than three years after Jackson was fired on September 14, 2009.  Without the element of the near-daily hugs/caresses over a long period of time it is not possible as a matter of law for Wilcox to establish that she was subjected to sexual harassment so "severe and pervasive" that it created a hostile environment for her, altering the terms and conditions of her employment.  Wilcox did testify "when [Jackson] would embrace [female employees], he would caress them down their back, and I even seen him one day caress one female all the way down

19

Plaintiff's failure to report that Jackson repeatedly hugged and caressed her is not excused by her perception that Jackson was favored by management.

Plaintiff argues that liability is established because Defendant had actual knowledge of Jackson's sexual harassment of Plaintiff; specifically, that Jackson's harassment of Plaintiff was so "open and notorious" that CCA must have known about it.   That is incorrect as to the thigh-grab/rub, fat juicy thighs comment, and the comment about the friend in the military.   The evidence established only that Jackson, Wilcox and Heller were present; possibly some unidentified staff may have walked by [Doc. 124 at 28-32, *Heller Test.*].   Plaintiff presented no evidence of who, if anyone, was present to observe the early morning hugs/caresses.

The evidence in the Golden Report of Jackson's misconduct in the control room, at the cookout at the training building, and outside the rest room would be helpful to Wilcox if there was any evidence in the record showing that either Wilcox or McRae management had any knowledge or likely knowledge that it existed prior to September 9, 2009.   However there is no such evidence either in the Golden Report or in the other trial evidence.   The evidence did not show Plaintiff was present at, or knew of, any of these incidents; thus they did not

---

to her buttocks" [Doc. 123 at 62].   This is properly considered in an analysis of whether Jackson's conduct as a whole was so severe and pervasive that it altered the terms and conditions of Plaintiff's employment.   But if the hugs/caresses of Wilcox by Jackson are removed from consideration this additional evidence is not enough to establish the requisite hostile environment necessary to alter the terms and conditions of Wilcox' employment.   At the same time, however, it is unclear under Eleventh Circuit precedent whether management's lack of knowledge of a harasser's conduct affects the "severe and pervasive" analysis.

contribute to a hostile work environment for her. Regardless of how the term "management" is defined in relation to McRae's workforce, Plaintiff's evidence did not show that McRae management either knew or likely knew of these incidents.

Both Officer Heller in her trial testimony and Officer Byron in her remarks to Shannon Pooler said that Jackson "hugged everybody," testimony which at first glance may suggest that management likely would have observed Jackson's "everybody" hugs. However, Heller and Byron both clearly stated that Jackson's hugs were not objectionable to them; Heller considered them to be a joke. A fundamental problem for Plaintiff is that there is no record testimony of what sort of hugs Heller and Byron were talking about. There is a vast difference between an arm-around-the-shoulder hug, even if accompanied by a back pat or brotherly back rub, and even if the hug is "real tight" on the one hand and a prolonged, languorous frontal embrace with back caresses on the other hand. The Court agrees that Wilcox' own testimony that Jackson "would hug and caress me down my back" and that "when [Jackson] would embrace [female employees] he would caress them down their back" describes possibly salacious conduct due to use of the word "caress" but regardless, there is no record evidence CCA management knew that Jackson "hugged and caressed" Wilcox or anyone else until years after Jackson was fired and this lawsuit was in the discovery phase.

Finally, the evidence shows as a matter of law that Warden Wells took appropriate, prompt remedial action in this case which bars Wilcox' claim. First, after Wilcox filed her July 10 complaint he instructed Jackson to stay away from Wilcox. This was appropriate action in light of what Wells actually knew at that time. While

Jackson did not fully obey this instruction, Wilcox agrees that Jackson never touched her or said anything sexually suggestive to her after that. There is no evidence that Wells or any other management level persons had any knowledge of Jackson's hugs/caresses of Plaintiff or any other salacious conduct, including the events in the Education Office, at the time. Wells did have actual notice of the butt-slap incident on July 10 because Wilcox filed a complaint on July 10. Accepting Plaintiff's testimony about this incident, it alone does not clearly qualify as sexual harassment. Rather, it is reflective of indecorous, inappropriate conduct which might or might not constitute sexual harassment. Moreover, Wells had legitimate doubts about Wilcox' version of the butt-slapping incident based on her track record of overreaction and making unfounded accusations. It was legitimate for him to take this into account in deciding how to proceed. See Baldwin v. Blue Cross/Blue Shield of Ala., 480 F.3d 1287, 1303 (11th Cir. 2007) (requiring an employer's investigation into purported sexual harassment be reasonable under the circumstances, but not requiring "the employer credit uncorroborated statements the complainant makes if they are disputed by the alleged harasser.").

Wells made a second decision as to how to proceed upon receipt of Wilcox' July 23 complaint on July 23. This complaint repeated the butt-slap claim of the July 10 complaint and added race discrimination claims. It was appropriate at that time to bring in an outside investigator. It undoubtedly took extra time to make these arrangements. Taking this into account, plus Wells' lack of knowledge of Plaintiff's contentions as to the early morning hugs/caresses, the thigh grabbing comment/incident, and the comment

about the friend in the military, an investigation by an outside investigator which did not conclude until September 9, 2009 was reasonably prompt as a matter of law. Once CCA management knew of the full extent of Jackson's actions on September 9, 2009, it fired Jackson on September 14, 2009. This constituted appropriate, prompt remedial action which is fatal to Plaintiff's sexual harassment claim. See Baldwin, 480 F.3d 1287 (11th Cir. 2007), Fleming v. Boeing Co., 120 F.3d 242 (11th Cir. 1997).

## 2. **Motion to Alter or Amend Judgment**

In its Motion to Alter or Amend Judgment under Fed. R. Civ. P. 59(e),[7] CCA argues that the punitive damages awarded by the jury should be vacated or substantially reduced by the Court [Doc. 112-1 at 14-24]. In response, Wilcox argues that CCA's motion is procedurally defective [Doc. 117 at 11-12], in that CCA did not specifically argue the absence of evidence to support punitive damages in its initial motion for judgment as a matter of law. Wilcox argues that CCA's Rule 59(e) motion is unavailing for that reason [Id. at 12-13]. In reply, CCA argues that its Rule 59(e) Motion is procedurally correct [Doc. 120 at 8-9], and its objection to punitive damages is not new [id. at 9-11] although insufficiency of evidence to justify punitive damages was not mentioned when CCA made its 50(a) motion at the close of Plaintiff's case. Finally, CCA argues the punitive damages award should be reduced to--at most--a constitutionally acceptable $16,000 [Id. at 15].

---

[7]Rule 59(e) simply provides: **"Motion to Alter or Amend a Judgment.** A motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e).

Because the Court has GRANTED CCA's Renewed Motion for Judgment as a Matter of Law [Doc. 112] thus vacating the compensatory award, CCA's Motion to Alter or Amend Judgment [Doc. 112] is DISMISSED AS MOOT. The Court notes there is no evidence here that CCA upper management (i.e., at the corporate level) acted with malice or reckless indifference towards Wilcox' rights as required under the law. See Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 534 (1999), Ash v. Tyson Foods, Inc., 664 F.3d 883, 900 (11th Cir. 2011)(citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002)).[8] There also is no evidence that Warden Wells or anyone on his management team acted with actual malice or reckless indifference to Wilcox' federally protected rights. However, CCA's failure to argue that the evidence was insufficient to support a punitive damages claim or to make a substantive objection to Wilcox' request for a punitive damages instruction might bar relief under Fed. R. Civ. P. 59(e).

**B.   CCA's Motion for Stay of Execution**

Because the Court has GRANTED CCA's Renewed Motion for Judgment as a Matter of Law [Doc. 112], there is no judgment to execute. As

---

[8]Both sides give undue deference to the Eleventh Circuit pattern charge on who is a manager for purposes of punitive damages liability, as the pattern charge does not reflect Eleventh Circuit precedent, specifically Ash v. Tyson Foods, Inc., 664 F.3d 883, 900-01 (11th Cir. 2011) (citing Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1280 (11th Cir. 2002)) (indicating that a manager must be higher up in the corporate hierarchy, or the behavior have been approved of or countenanced by someone higher up in the hierarchy for punitive damages to be awarded) and Miller, 277 F.3d at 1280 (same). See EEOC v. Exel, Inc., No: 1-10-CV-3132-SCJ, 2014 WL 12538166, at *10 (N.D. Ga. Feb. 6, 2014) (Jones, J.) (noting that pattern jury charges do not control over circuit precedent).

a result, CCA's Motion for Stay of Execution [Doc. 115] is DISMISSED AS MOOT.

### C.   Wilcox' Motion for Attorneys' Fees and Expenses and Supplemental Motion for Attorneys' Fees

Because the Court has GRANTED CCA's Renewed Motion for Judgment as a Matter of Law [Doc. 112], Wilcox is no longer a prevailing party.   Thus, Wilcox' Motion for Attorneys' Fees and Expenses [Doc. 107] and Supplemental Motion for Attorneys' Fees [Doc. 116] are both DISMISSED AS MOOT.

### D.   Wilcox' Motion for Writ of Execution

Because the Court has GRANTED CCA's Renewed Motion for Judgment as a Matter of Law [Doc. 112], Wilcox no longer has a judgment to collect.   Thus, Wilcox' Motion for Writ of Execution [Doc. 129] is DISMISSED AS MOOT.

## III. Conclusion

For the reasons stated above, Defendant Corrections Corporation of America's Renewed Motion for Judgment as a Matter of Law or to Alter or Amend Judgment [Doc. 112] is GRANTED IN PART, and DISMISSED AS MOOT IN PART.   Specifically, CCA's Renewed Motion for Judgment as a Matter of Law [Doc. 112] is GRANTED and CCA's Motion to Alter or Amend Judgment [Doc. 112] is DISMISSED AS MOOT.     The Clerk is DIRECTED to enter judgment in favor of Defendant Corrections Corporation of America, costs taxed to Plaintiff.

Defendant Corrections Corporation of America's Motion for Stay of Execution [Doc. 115], Plaintiff Wilcox' Motion for Attorneys' Fees and Expenses [Doc. 107], Plaintiff Wilcox' Supplemental Motion for Attorneys' Fees [Doc. 116], and Plaintiff Wilcox' Motion for Writ of Execution [Doc. 129] are all DISMISSED AS MOOT.

SO ORDERED, this  31  day of March, 2017.

ORINDA D. EVANS
UNITED STATES DISTRICT JUDGE

26

# TAB NO. 132

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FELICIA A. WILCOX,

               Plaintiff,

vs.

CORRECTIONS CORPORATION OF
AMERICA a/k/a McRae Correctional
Facility,

               Defendant.

CIVIL ACTION FILE

NO. 1:11-cv-04365-ODE

## J U D G M E N T

    This action having come before the court, Honorable Orinda D. Evans, United States District Judge, for consideration of Defendant Corrections Corporation of America's Motion to Alter Clerk's Judgment and Motion for Judgment as a Matter of Law, and the court having GRANTED IN PART and DENIED IN PART said motions, it is

    **Ordered and Adjudged** that the plaintiff take nothing; that the defendant recover its costs of this action, and the action be, and the same hereby, is **DISMISSED**.

    Dated at Atlanta, Georgia, this 31st day of March, 2017.

                            JAMES N. HATTEN
                            CLERK OF COURT

                    By:  s/ Brittney Walker
                            Deputy Clerk

Prepared, Filed, and Entered
in the Clerk's Office
March 31, 2017
James N. Hatten
Clerk of Court

By:  s/ Brittney Walker
       Deputy Clerk

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of July, 2017, I electronically filed the foregoing with the Court's CM/ECF system, which will automatically send an email notification of such filing to the following counsel of record:  John T.L. Koenig, Esq., email: john.koenig@btlaw.com, at BARNES & THORNBURG LLP, Suite 1700, Prominence in Buckhead, 3475 Piedmont Road, N.E., Atlanta, GA 30305-2954.

*/s/ Neil L. Henrichsen*
Neil L. Henrichsen